UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATE OF AMERICA, | ) | |
| *ex rel.* ROBERT POPPLEWELL | ) | |
| and TODD SHIPLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:15-cv-00649 |
| v. | ) | |
| | ) | Judge Sharp |
| BRITTON BRIDGE, LLC, | ) | Magistrate Judge Knowles |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

Presently pending before the Court are Defendant Britton Bridge, LLC's Motion to Dismiss Certain Portions, and to Strike Certain Other Portions, of the Complaint, (Docket No. 15), and an Amended Motion to Dismiss and to Strike, (Docket No. 21) (collectively "Motions to Dismiss/Strike"). Plaintiffs/Relators Robert Popplewell and Todd Shipley ("Relators"), who are acting on behalf of the United States, have filed Responses in Opposition to Defendant's Motions to Dismiss. (Docket Nos. 19, 27). For the reasons set forth below, Defendant's Motions to Dismiss/Strike will be granted in part and denied in part.

**I.   Factual & Procedural Background**[1]

This case arises from construction performed by Defendant Britton Bridge, LLC ("Britton Bridge" or "the Company") on the Henley Street Bridge in Knoxville, Tennessee ("Henley Bridge"). In 2009, the Tennessee Department of Transportation ("TDOT") sought federal funding to replace Henley Bridge's deck and to add a sixth lane of traffic. TDOT estimated that the project would cost $30 million and invited bids for the rehabilitation work in 2010. Britton Bridge submitted a $24,696,969.47 bid for the project in September 2010. Two

---

[1] Unless stated otherwise, the following facts are drawn from the Complaint, Docket No. 1.

1

other contractors also submitted bids, one for approximately $30.7 million and the other for approximately $54.7 million. TDOT selected Britton Bridge and accepted the Company's bid in October 2010. TDOT and Britton Bridge entered into a contract for the Henley Bridge work.

The scope of the contract was based on studies assessing the condition of the bridge. According to Relators, a structural condition study revealed "some concrete deterioration, but no major structural deficiencies and relatively good concrete strength and quality throughout the Bridge." (Docket No. 1 at ¶ 16). Relators allege that the United States Department of Transportation, Federal Highway Administration awarded TDOT just over $29 million for the Henley Bridge work.

Britton Bridge commenced its work on the Henley Bridge in January 2011. According to Relators, workplace problems arose almost immediately. One employee was killed due to allegedly unsafe equipment and inadequate training just three weeks into the project. Another employee died in May 2011, again due to unsafe conditions and inadequate training. Britton Bridge also made "errors in assessing spandrel base elevations and locations," which meant the new spandrels did not properly align the supporting columns. (Id. at ¶ 18(c)). The work also ran behind schedule, causing TDOT to ask Britton Bridge to voluntarily refrain from submitting future bids on other projects.

Relators Popplewell and Shipley are skilled carpenters with 26 and 30 years of experience in construction, respectively. Both performed work on the Henley Bridge on behalf of Britton Bridge. The above-described workplace problems led to an exodus of experienced construction workers and Britton Bridge allegedly filled their spots with undocumented workers. Relator Popplewell observed Britton Bridge hiring undocumented workers, forcing them to leave the site during government inspections, and then rehiring them after the inspections. He also

2

observed Britton Bridge terminate and re-hire the same individual 3 or 4 times. The contract between Britton Bridge and TDOT required the Company to make periodic certifications that it did not knowingly use undocumented workers for work on Henley Bridge. Relators allege that the Company falsified these certifications while knowingly relying on undocumented employees.

Relators also allege an entirely separate form of fraud stemming from the structural integrity of Pier 5, one of the Henley Bridge's piers over the Tennessee River. In December 2012 Britton Bridge foreman Dwayne Sweeten and owner Jerry Britton told Relators to take a jackhammer to Pier 5 to "rough it up good." (Id. at ¶ 25). Relators were told to make a hole in the pier, even though they expressly noted that doing so would render an otherwise safe and sound pier unsafe. Despite Relators' protests, Britton Bridge ordered them to drill a hole in Pier 5. Relators used a 30-pound jackhammer to create an 18-inch hole at a load-bearing location in Pier 5's concrete. Britton Bridge then reassigned Relators to work on different parts of the Henley Bridge, away from Pier 5.

Approximately a month later, Britton Bridge submitted a Request for Construction Changes ("Request"), which sought an additional payment of $5,885,012.49 and an extension of time to complete the project. The Request was meant to "address the additional work required in modifying pier construction for Piers 3, 4, and 5." (Id. at ¶ 30). It also noted that the extent of necessary repairs to the piers' concrete had only been revealed during their "investigative efforts." (Id. at ¶ 32). Relators allege that Britton Bridge merely performed sounding and visual inspections and did not conduct any objective testing to support the contents of the Request. Indeed, the Request is inconsistent with previous concrete core testing of the piers, including Pier 5. Relators allege that "Britton Bridge purposefully drilled a hole in a load-bearing portion of Pier 5 and then fraudulently used that hole as evidence of concrete degradation . . . to make its

3

claim for payment of an additional $5.88 million." (Id. at ¶ 36). TDOT approved Britton Bridge's Request and awarded the Company the additional funding it requested.

Relators filed suit for fraud against the Government under the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.* They allege that Britton Bridge purposefully underbid the project and then created an unsafe condition on Pier 5 in order to solicit additional payment. (Id. at ¶ 41). Relators also allege that Britton Bridge falsely certified its compliance with federal immigration laws in its personnel practices on multiple occasions. (Id. at ¶ 42). Thus, although Relators only brought one cause of action, their FCA claim rests on two distinct forms of fraud. The United States declined to intervene in the action, (Docket No. 12), and the Complaint was unsealed and served on Britton Bridge in December 2015.

Britton Bridge now asks the Court to dismiss paragraphs 1, 19, 20, 21, 22, and 42 of the Complaint for lack of subject matter jurisdiction. Britton Bridge contends that because information about the Company's use of undocumented workers was broadcasted by the news media in 2011, the FCA's public disclosure provision deprives this Court of jurisdiction over any FCA claim based on such allegations. In the alternative, Britton Bridge asks the Court to strike Paragraphs 18, 19, and 23 of the Complaint on the ground that those paragraphs include immaterial, impertinent, and scandalous information. The Court will dismiss certain portions of the FCA claim, but declines to strike the requested paragraphs.

## II. Request to Dismiss Certain Portions of the Complaint Under Rule 12(b)(6)

### A. Legal Standard

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the complaint

4

"need to be sufficient to give notice to the Defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662 (2009)).  In deciding a motion to dismiss under Rule 12(b)(6), the Court must assume that all of the factual allegations are true, even if they are doubtful in fact.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In contrast, legal conclusions are not entitled to the assumption of truth, Iqbal, 556 U.S. at 578-79, and "a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555 (internal citations and quotation marks omitted).

A motion to dismiss under Rule 12(b)(6) requires a careful "consideration the allegations in the complaint, but matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint, also may be taken into account."  Gardner v. United States, 443 F. App'x. 70, 73 (6th Cir. 2011) (quoting Amini v. Oberlin College, 259 F.3d 493, 502 (6th Cir. 2001)).  The Sixth Circuit has taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6).  Extrinsic materials that "fill in the contours and details" of a complaint without adding anything new may be considered without converting the motion to one for summary judgment.  Yeary v. Goodwill Indus.–Knoxville, Inc., 107 F.3d 443, 445 (6th Cir. 1997); Armengau v. Cline, 7 F. App'x. 336, 344 (6th Cir. 2001).  Here, Britton Bridge has submitted an affidavit and accompanying exhibits comprised of news media coverage of the construction on Henley Bridge.  (Docket Nos. 18-1 to 18-6).  Relators have neither disputed the factual accuracy of any of these submissions nor contested the Court's consideration of such submissions.  Accordingly, the Court will use Defendant's exhibits without converting Defendant's Motion into a motion for summary judgment.

B.  <u>The False Claims Act Framework</u>

The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval; [or] conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a)(1) & (3). Violators of the FCA are subject to civil penalties of up to $10,000 as well as double or treble damages. 31 U.S.C. § 3729(a)(7). To promote enforcement of the statute, Congress has directed that an FCA action may be initiated in one of two ways. First, the government itself may pursue a civil action against the alleged false claimant. 31 U.S.C. § 3730(a). Second, as here, a private individual (the relator) may bring a qui tam action for alleged FCA violations on behalf of the government. 31 U.S.C. § 3730(b). The statute incentivizes private individuals to come forward with knowledge of fraud by entitling them to a portion of any proceeds recovered under a successful FCA lawsuit. Through this incentive, the FCA seeks to encourage "'whistleblowers to act as private attorneys-general' in bringing suits for the common good," <u>Walburn v. Lockheed Martin Corp.</u>, 431 F.3d 966, 970 (6th Cir. 2005) (quoting <u>United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.</u>, 41 F.3d 1032, 1041-42 (6th Cir. 1994)), while also seeking "to discourage opportunistic plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud," <u>id.</u>

To strike this balance, the FCA includes a number of jurisdictional limitations on qui tam actions, one of which is relevant here: The public disclosure provision removes federal jurisdiction over FCA actions "based on the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing . . . or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the

information."  31 U.S.C. § 3730(e)(4)(A).  Allegations that have previously been subject to public disclosures simply cannot form the basis of a claim under the FCA.  With that in mind, the Court turns to the allegations at issue here.

    C.  Application of the Public Disclosure Provision

Defendants point to media coverage of Britton Bridge's work on the Henley Bridge as evidence that public disclosure of the Company's allegedly fraudulent use of undocumented workers predated this litigation by four years.  Relators dispute application of the public disclosure provision, arguing that even if the Company's *use* of undocumented workers had been publicly disclosed, Britton Bridge's *fraud* on the government via false certifications was not.  On this score, the Britton Bridge presents a more compelling argument.

To determine whether § 3730(e)(4)(A)'s jurisdictional bar applies, a court must consider "first whether there has been any public disclosure of fraud, and second whether the allegations in the instant case are 'based upon' the previously disclosed fraud."  United States ex rel. Gilligan v. Medtronic, Inc., 403 F.3d 386, 389 (6th Cir. 2005).  If the answer to either question is "yes," then the case is jurisdictionally barred.  The Court will address each question in turn.

*1.  The Media Coverage Constitutes a Public Disclosure*

The Sixth Circuit has identified two categories of public disclosures.  See U.S. ex rel. Poteet v. Medtronic, Inc., 552 F.3d 503, 512 (6th Cir. 2009).  First, "if the information about both a false state of facts and the true state of facts has been disclosed, we [will] find that there has been an adequate public disclosure because fraud is implied."  Gilligan, 403 F.3d at 389.  Second, "if there has been a direct allegation of fraud, we will find a public disclosure because such an allegation, regardless of its specificity, is sufficient to put the government on notice of

7

the potential existence of fraud." Id. In U.S. ex rel. Poteet, the Sixth Circuit further clarified what constitutes a public disclosure revealing fraud:

> For a relator's qui tam action to be barred by a prior "public disclosure" of the underlying fraud, the disclosure must have (1) been public, and (2) revealed the same kind of fraudulent activity against the government as alleged by the relator. With respect to this first element, the FCA clarifies that a prior disclosure of fraud is public if it appears in the news media or is made in a criminal, civil, or administrative hearing, or in a congressional, administrative, or Government Accounting Office report, audit, or investigation. "Public disclosure" also includes documents that have been filed with a court, such as discovery documents, and a plaintiff's complaint. . . . As for the second element, we have held that a public disclosure reveals fraud if the information is sufficient to put the government on notice of the likelihood of related fraudulent activity. To qualify as a public disclosure of fraud, the disclosure is not required to use the word "fraud" or provide a specific allegation of fraud. Moreover, the information suggesting fraud need not even come from the same source as long as the different sources together provide information that leads to a conclusion of fraud.

U.S. ex rel. Poteet, 552 F.3d at 511-12 (citations and internal quotation marks omitted). Put simply, to bar jurisdiction a previous public disclosure need not invoke any magic words but must include enough information about the allegedly fraudulent activity to give the government notice.

Relators dispute that any such disclosures occurred here. According to them, media coverage of the construction of the Henley Bridge merely noted that one employee lacked proper work authorization. (Docket No. 19 at 3). They contend that their allegations go well beyond such statements to assert "that Britton Bridge knowingly hired undocumented workers and then made false periodic certifications to governmental agencies to the contrary as part of a fraudulent scheme to extract payment." (Id.). However, the exhibits attached to the Affidavit of James W. White, (Docket Nos. 18-1 to 18-6), indicate otherwise. For example, Exhibit F is a compendium of news media coverage of the Henley Bridge construction. The various news articles in the compendium contain the following statements:

8

- "The contractor [Jerry Britton] had previously certified that, to his knowledge, all of his employees were legally eligible to work in the U.S., said Nagi, adding that TDOT is unaware of any undocumented workers being employed by Britton Bridge. The spokesman also referenced Tennessee Governor's Executive Order No. 41, which prohibits all state entities from contracting with any person who 'knowingly' employs illegal immigrants." (Doc. No. 18-6 at 12-13).

- "The death of Estrada-Jimenez also raises questions about the company's hiring practices. A governor's executive order prohibits state entities from contracting with a company that knowingly employs illegal immigrants. State officials should call on federal Immigration and Customs Enforcement officers to investigate Britton Bridge." (Doc. No. 18-6 at 18).

- "The initial confusion over the victim's identity is drawing scrutiny regarding hiring practices. TDOT requires all contractors and subcontractors to attest that they will not knowingly hire illegal workers. Britton said his company is 're-examining every policy associated with this tragic accident, including the way we check the identity /work-authorization status of employees.'" (Doc. No. 18-6 at 22).

- "An illegal immigrant worker had a role in the first fatal accident this year on the Henley Bridge reconstruction project, the victim in a second fatal accident may have been here illegally, and a federal investigation is under way to determine if contractor Britton Bridge LLC knowingly hired illegal immigrants, according to state documents. . . . All TDOT is empowered to do regarding illegal immigrant workers is to require companies getting state contracts to sign a pledge that they will not hire them. 'If they don't sign, they won't get the contract. But we can't investigate, as we don't have an investigative arm,' said Lyndsay Botts, a TDOT spokeswoman. So TDOT called on the Department of Labor and Workforce Development. State authorities ordered a halt to work on the Henley Bridge and a number of projects involving Britton and an affiliate in Tennessee after Estrada-Jimenez's death so that safety reviews could be conducted." (Doc. No. 18-6 at 25).

These statements are more than sufficient to put the government on notice of the fraud alleged here: knowingly hiring undocumented workers while submitting false certifications denying the same. One even explicitly called for a federal investigation. All of these statements are in the public domain via news outlets such as The Knoxville News Sentinel. Thus, they qualify as public disclosures and bar jurisdiction to the extent they form the basis for Relators' FCA claim.

### 2. *Do the Public Disclosures Support Relators' FCA Claim?*

The Court must next determine to what extend the information in the public disclosures forms the basis for Relators' FCA claim. In Poteet, the Sixth Circuit explained when an FCA claim is based on a public disclosure:

> Not a single circuit has held that a *complete* identity of allegations, even as to time, place, and manner is required to implicate the public disclosure bar; rather all have held, at a minimum, that dismissal is warranted where the plaintiff seeks to pursue a claim, the essence of which is 'derived from' a prior public disclosure.

Poteet, 552 F.3d at 514 (quoting United States ex rel. Boothe v. Sun Healthcare Group, Inc., 496 F.3d 1169, 1174 (10th Cir. 2007)) (emphasis in original). The Poteet Court also noted that the Sixth Circuit's "broad construction of the public disclosure bar . . . precludes individuals who base *any part* of their allegations on publicly disclosed information from bringing a later qui tam action." Id. (quoting United States ex rel. McKenzie v. BellSouth Telecommunications, Inc., 123 F.3d 935, 940 (6th Cir. 1997)) (emphasis in original). Paragraph 42 of the Complaint asserts an FCA claim grounded in Britton Bridge's use of undocumented workers and submission of fraudulent certifications denying the same. These allegations were sufficiently encompassed by the above-discussed public disclosures. The Court therefore agrees with Britton Bridge that the Sixth Circuit's broad interpretation of the public disclosure rule bars Relators' FCA claim insofar as it relates to the use of undocumented workers.

Britton Bridge does not argue for dismissal of the FCA claim as it relates to the Pier 5 fraud, nor could it. Although the Complaint includes only one cause of action, a violation of the FCA, the allegations of fraud set forth in Paragraphs 41 & 43 of the Complaint refer to a

completely distinct form of fraud and have nothing to do with the public disclosures detailed above. Accordingly, the FCA claim will be dismissed only in part.

### III. Request to Strike Portions of the Complaint Under Rule 12(f)

Britton Bridge also asks the Court to strike certain paragraphs of the Complaint—specifically, Paragraphs 18, 19, and 23—which it believes lack "any relation or logical connection" to Relators' FCA claim. (Docket No. 16 at 6). Britton Bridge additionally argues that these paragraphs are "highly prejudicial" in nature. (Id.). Relators respond by noting that motions to strike are a drastic and strongly disfavored remedy, reserved for extreme circumstances not present here. Rather than being irrelevant, Relators contend that the purportedly scandalous paragraphs are "integral" to their claims insofar as they shed light on Britton Bridge's fraudulent intent. (Docket No. 19 at 5).

Rule 12(f) should be "sparingly used," Brown & Williamson Tobacco Corp. v. United States, 201 F.2d 819, 822 (6th Cir. 1953), and 12(f) motions should be granted "only when the pleading to be stri[c]ken has no possible relation to the controversy," Parlak v. U.S. Immigration & Customs Enf't, 2006 WL 3634385, at *1 (6th Cir. 2006). See also State Farm Fire & Cas. Co. v. Specialty Surgery Ctr., PLLC, No. 2:15-cv-26, 2015 WL 6696001, at *2 (M.D. Tenn. Nov. 3, 2015). The contents of Paragraphs 18, 19, and 23 go to the work conditions and the progress toward completion of the Henley Bridge construction. The Court agrees with Relators that such information provides useful context and may illuminate the alleged fraud. The paragraphs are therefore relevant to the controversy and striking them from the Complaint would be inappropriate.

**IV.     Conclusion**

For the above-stated reasons, the Court will grant in part and deny in part Britton Bridge's Motions to Dismiss/Strike. The FCA claim will be dismissed to the extent it is based on the Company's alleged use of undocumented workers, something which has already been the subject of public disclosures by the news media. The request to strike certain paragraphs of the Complaint will be denied.

A separate order shall enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE